## NATIONAL ARBITRATION PANEL

In the Matter of Arbitration )
                       )
between )
                       )
UNITED STATES POSTAL )
SERVICE )     Case No. Q94C-4Q-C 98117564
                       )
and )
                       )
AMERICAN POSTAL WORKERS )
UNION )
                       )
with )
                       )
NATIONAL ASSOCIATION OF )
LETTER CARRIERS, Intervenor )

**RECEIVED MAY - 5 2003**
**COLLECTIVE BARGAINING AND ARBITRATION LABOR RELATIONS**

BEFORE:           Carlton J. Snow, Professor of Law

APPEARANCES:      For the Employer:  Mr. Howard J. Kaufman

                      For the APWU:    Ms. Melinda K. Holmes

                      For the NALC:     Mr. Gary H. Mullins
                                            Mr. Allen J. Apfelbaum

PLACE OF HEARING:  Washington, D.C.

DATES OF HEARINGS:      February 22, 2002
                              July 23, 2002

POST-HEARING BRIEFS:    February 10, 2003

NATIONAL ARBITRATION PANEL

RECEIVED
MAY – 5 2003
COLLECTIVE BARGAINING AND ARBITRATION
LABOR RELATIONS

| | |
|---|---|
| IN THE MATTER OF ARBITRATION )<br><br>BETWEEN )<br><br>UNITED STATES POSTAL )<br>SERVICE )<br><br>AND )<br><br>AMERICAN POSTAL WORKERS )<br>UNION )<br><br>WITH )<br><br>NATIONAL ASSOCIATION OF )<br>LETTER CARRIERS )<br>(Case No. Q94C-4Q-C 98117564) ) | ANALYSIS AND AWARD<br><br>Carlton J. Snow<br>Arbitrator |

## I.    INTRODUCTION

This matter initially arose under the 1990 collective bargaining

agreement but was processed under the 1994-98 agreement between the

Employer and the American Postal Workers Union. Pursuant to Article

15.5.A, the National Association of Letter Carriers intervened in the matter.

Hearings occurred on February 22, 2002 and July 23, 2002. The parties

briefed the matter in February of 2003. Mr. Howard J. Kaufman, Senior

Counsel, represented the United States Postal Service. Ms. Melinda K.

Holmes of O'Donnell, Schwartz & Anderson, represented the American

Postal Workers Union. Messrs. Gary H. Mullins, Vice-president, and Alan J.

Apfelbaum, Contract Administration Unit, represented the National

Association of Letter Carriers.

The hearings proceeded in an orderly manner. There was a full

opportunity for the parties to submit evidence, to examine and cross-examine

witnesses, and to argue the matter. All witnesses testified under oath as

administered by the arbitrator. The advocates fully and fairly represented

their respective parties. A reporter for Diversified Reporting Services, Inc.

reported the proceeding for the parties and submitted a transcript of 436

pages in two volumes.

There were no challenges to the substantive or procedural

arbitrability of the dispute, although the American Postal Workers Union

objected to allowing the Employer's affirmative defenses on the theory that

management failed to respond with those defenses when the parties processed

the grievance. Otherwise, the parties stipulated that the matter properly is

before the arbitrator and authorized the arbitrator to resolve all jurisdictional

issues in the dispute. They granted the arbitrator authority to retain

jurisdiction in the matter for 90 days following the issuance of a decision. All

parties received an opportunity to submit a post-hearing brief, but the

National Association of Letter Carriers chose not to do so. The arbitrator

2

officially closed the hearing on February 10, 2003 after receipt of the final

post-hearing brief in the matter.

## II.    STATEMENT OF THE ISSUES

The issues before the arbitrator are as follows:

1.    Does the arbitrator have authority to consider the Employer's affirmative defenses?

2.    Shall the "Address Management System Specialist" position be included in the APWU bargaining unit? Alternatively, does this position contain duties belonging in the APWU bargaining unit? If so, what is an appropriate remedy?

## III.    RELEVANT CONTRACTUAL PROVISIONS

### ARTICLE I UNION RECOGNITION

**Section L Union**
The Employer recognizes the Union designated below as the exclusive bargaining representative of all employees in the bargaining unit for which each has been recognized and certified at the national level:

American Postal Workers Union, AFL-CIO--Maintenance Employees
American Postal Workers Union, AFL-CIO--Special Delivery Messengers
American Postal Workers Union, AFL-CIO--Motor Vehicle Employees
American Postal Workers Union, AFL-CIO--Postal Clerks

American Postal Workers Union, AFL-CIO--Mail Equipment Shops
    Employees
American Postal Workers Union, AFL-CIO--Material Distribution Centers -
    Employees

Section 2. Exclusions
    The employee groups set forth in Section 1 above do not include,
and this Agreement does not apply to:

1.  Managerial and supervisory personnel;
2.  Professional employees;
3.  Employees engaged in personnel work in other than a purely
    non-confidential clerical capacity;
4.  Security guards as defined in Public Law 91-375, 1201(2);
5.  All Postal Inspection Service employees;
6.  Employees in the supplemental work force as defined in Art. 7;
7.  Rural letter carriers; or
8.  Mail handlers; or
9.  Letter carriers.

Section 3. Facility Exclusions
    This Agreement does not apply to employees who work in other
employer facilities which are not engaged in customer services and mail
processing, previously understood and expressed by the parties to mean
mail processing and delivery, including but not limited to Headquarters,
Area Offices, Information Services Centers, Postal Service Training and
Development Institute, Oklahoma Postal Training Operations, Postal
Academies, Postal Academy Training Institute, Stamped Envelope Agency
or Mail Transport Equipment Centers.

Section 5. New Positions
    A. Each newly created position shall be assigned by the Employer
to the national craft unit most appropriate for such position within thirty
(30) days after its creation. Before such assignment of each new position
the Employer shall consult with the Union signatory to this Agreement for
the purpose of assigning the new position to the national craft unit most
appropriate for such position. The following criteria shall be used in
making this determination.

1.  existing work assignment practices;
2.  manpower costs;
3.  avoidance of duplication of effort and "make work"
    assignments;

4

4. effective utilization of manpower, including the Postal
Service's need to assign employees across craft lines on a
temporary basis;

5. the integral nature of all duties which comprise a normal duty
assignment;

6. the contractual and legal obligations and requirements of the
parties.

B. The Union party to this Agreement shall be notified promptly by
the Employer regarding assignments made under this provision. Should the
Union dispute the assignment of the new position within thirty (30) days
from the date the Union has received notification of the assignment of the
position, the dispute shall be subject to the provisions of the grievance and
arbitration procedure provided for herein.

IV.    STATEMENT OF FACTS

In this case, the American Postal Workers Union challenged the

Employer's placement of an employment position outside the APWU

bargaining unit. At the heart of the dispute is the Address Management

System. AMS is a computer data-base used to manage address information

of postal customers. Bargaining unit employees in the Clerk Craft have

performed work using the AMS, according to the APWU. The Employer

responded that bargaining unit employees performed "key what you see" data

entry for the AMS during a limited amount of time as the system was being

merged with another program. In 1990-92, the Employer underwent a

significant reorganization; and the "AMS Specialist" position came into

5

existence. In the Employer's view, this is not a new position. It allegedly was the previously existing "AMS Analyst" position simply with a new title. The Employer maintains that the disputed position has existed since 1982 when management created the "AMS Analyst" position, and the Employer asserts that the disputed position has existed outside of the bargaining unit since its creation. It is an "executive and administrative schedule" position and, as such, appropriately is not part of the bargaining unit, according to the Employer.

The APWU contends that it earlier wanted to vindicate its contractual rights to the disputed position but was barred from doing so because of an arbitration decision by Arbitrator Gamser. (*See* Case No. A-C-N 6922 (1990).) The Union contends that, during the 1986-90 time period and before, APWU bargaining unit members filed grievances over the fact that nonbargaining unit employees doing the disputed work were performing bargaining unit work. (*See* Tr. 76.) None of the grievances, however, proceeded to arbitration. (*See* Tr. 61.)

In October of 1997, the American Postal Workers Union filed a unit clarification petition with the National Labor Relations Board. The APWU sought to have the Board clarify its bargaining unit to include the disputed job classification. Before the Board issued a unit clarification

6

decision, the APWU filed a national level grievance in 1998 to determine

whether the "AMS Specialist" position should be included in the APWU

bargaining unit or, alternatively, whether duties of the position more properly

belong to workers in the bargaining unit. The Employer and the APWU later

signed a settlement agreement in which the Union agreed to withdraw the

unit clarification position with an understanding that the matter would be

resolved in arbitration. With this as its factual background, the dispute came

to the arbitrator for resolution.

## V.    POSITION OF THE PARTIES

### A.    The American Postal Workers Union

As a threshold matter, the APWU contends that the Employer's

affirmative defenses should not be considered by the arbitrator because the

Employer allegedly failed to argue its current defenses when the parties

processed the grievance. The Union contends that a Step 4 grievance, the

step preceding arbitration, requires a meeting and decision from the Employer

in response to the complaint. The Union also relies on arbitral precedent in

the parties' system stating that a party cannot present evidence or arguments

7

in arbitration that were not presented at earlier phases of the grievance process. (*See* Case No. NC-E 11359, p. 3 (1984).) Even if this arbitrator should reach the merits of the Employer's case, the Union maintains that management's defenses fail to support its position.

The Union contends that external law should not be a focal point in deciding this dispute because it is a case of contract interpretation. According to the Union, standard rules of contract interpretation provide a sufficient basis for resolving the dispute; and resort to external law is unnecessary. Hence, the Union urges the arbitrator to focus narrowly on the language of the parties' agreement.

On the merits, the Union contends that workers assigned to the "AMS Specialist" position perform duties that are a part of the Clerk Craft. In the opinion of the APWU, none of the duties is excluded from the bargaining unit. Accordingly, the APWU argues that the disputed position should be adjudged to be a part of the APWU bargaining unit. Moreover, the Union believes that the "AMS Specialist" position should have been included in the bargaining unit from the moment it first was created. According to the Union's view, even if management had a right to allow supervisors to perform minimal duties belonging to the bargaining unit, those duties must be assigned to the bargaining unit once they become a significant portion of a supervisor's

8

workload. It is the conclusion of the APWU that none of the duties of the

"AMS Specialist" position is excluded from the bargaining unit and,

therefore, that the entire position is more appropriately placed within the

APWU bargaining unit. It is the belief of the Union that the Employer, in

effect, created a Clerk Craft position outside of the APWU bargaining unit

and did so in violation of the parties' National Agreement. Even if the

position should not be in the bargaining unit, the APWU contends that work

performed by AMS Specialists belongs within the bargaining unit.

B.    The Employer

First, the Employer contends that it has every right to present its

affirmative defenses in this case to the arbitrator. Relying on Article 15 of the

parties' National Agreement, the Employer points out that any failure by

management to render a decision during steps of the grievance procedure

merely moves the dispute to the next step; and the next step in this case is

arbitration. Moreover, the Employer maintains that the Union is not surprised

and has not been prejudiced by any arguments brought forth by management

in arbitration because the Employer's position clearly was made known

9

during extensive negotiation that led to the APWU's decision to withdraw the unit clarification petition and to move the matter to arbitration. Accordingly, the Employer concludes that there is no basis in contract or equity for excluding the Employer's affirmative defenses.

On the merits, the Employer contends that, if the "AMS Specialist" position should become a part of the APWU bargaining unit, it should occur only because AMS Specialists collectively decide to join the bargaining unit. Any such change should be the result of an election. The Employer contends that it is inappropriate to use an administrative procedure such as arbitration to force AMS Specialists into the APWU bargaining unit when their position historically has been excluded from it. It is the view of the Employer that the "AMS Specialist" position has been in existence for over 20 years and that it merely underwent a name change after 1992. The position has not changed significantly, according to management.

The Employer also contends that, even though APWU bargaining unit members might have performed peripheral duties, they have not been responsible for core functions of the "AMS Specialist" position. When management merged the AMS program with a different one, the Employer used some bargaining unit members to enter the large amount of data necessary to combine the programs. The Employer argues that data

10

entered by AMS Specialists has to be reviewed and analyzed; and bargaining unit employees merely entered data without engaging in any sort of analysis. Management contends that bargaining unit members used a "key what you see" method of data entry but that AMS Specialist engaged in far more complicated work. As a consequence, the Employer concludes that the APWU is incorrect in its belief that management removed work from bargaining unit members.

Nor, in the opinion of the Employer, is it adequate for the Union to rely on a Position Description to conclude that AMS Specialists belong in the APWU bargaining unit. Furthermore, the Employer rejects the Union's contention that AMS Specialists perform exclusively bargaining unit duties. At issue, in the opinion of the Employer, is whether certain overlapping duties traditionally and historically performed by AMS Specialists constitute mail processing activity to which only APWU bargaining unit members may lay claim. In the Employer's view, duties of AMS Specialists are not exclusive to the APWU because the duties are not traditional mail processing duties.

The Employer stresses the fact that no evidence shows current AMS Specialists desire to be included in the APWU bargaining unit. To force them into the bargaining unit would be to ignore the fundamental principle of free choice, according to the Employer. The Employer argues

11

that, for the Union to prevail, it needs the majority consent of those currently holding "AMS Specialist" positions. Whether interpreting the collective bargaining agreement or relying on external law, the Employer maintains that it must prevail in this matter.

12

VI.    ANALYSIS

A.    The Employer's Affirmative Defenses

The Union argues that the arbitrator is without contractual authority to consider the Employer's affirmative defenses. As Professor Ted St. Antoine made clear many years ago, an arbitrator is the parties' officially designated "contract reader;" and the primary source of guidance in the dispute is the parties' National Agreement. *(See* 30 NAA, 29, 30 (1977).) Article 15 of the National Agreement describes the parties' grievance-arbitration procedure, and Article 15.4.C of the collective bargaining agreement is instructive with regard to the APWU's contention that the arbitrator is without authority to consider the Employer's affirmative defenses. Article 15.4.C states:

> Failure by the Employer to schedule a meeting or render a decision in any of the Steps of this procedure within the time herein provided (including mutually agreed to extension periods) shall be deemed to move the grievance to the next Step of the grievance-arbitration procedure. *(See* Joint Exhibit No. 1, p. 100, emphasis added.)

The parties' agreement is clear and unambiguous in its application to the facts of the case. Management's failure to set forth its affirmative defenses moved the grievance to the Step beyond Step 4, namely, arbitration at the national level. The Employer sustained a penalty as a result of its approach, but not

13

the one the Union seeks to impose.  The penalty for not disclosing affirmative defenses is that they now must be heard and resolved by an arbitrator, instead of being used as the building blocks of a negotiated settlement in Step 4 of the grievance procedure.

Interpretations of a labor contract with a different union and the Employer might require a more rigid process at the national level.  For example, the relevant language of the APWU and NALC national agreements is not precisely the same.  Decisions interpreting similar contractual provisions in the agreement between the Employer and the National Association of Letter Carriers might constrict an arbitrator's authority to consider claims not advanced in Step 4.  Arbitrator Aaron in 1984 interpreted the NALC-USPS agreement and concluded that:

> Parties to an arbitration under a National Agreement between the Postal Service and a signatory Union are barred from introducing evidence or arguments not presented at preceding steps of the grievance procedure, and (it is now well settled) that this principle must be strictly observed.  The reason for the rule is obvious: neither party should have *to deal with* evidence or argument presented for the first time in an arbitration hearing, which it has not previously considered and for which it had no time to prepare rebuttal evidence and argument.  (*See* USPS and NALC Case No. NC-E-11359, pp. 3-4 (1984), emphasis added.)

The language in the "grievance procedure-arbitration" article of both parties' agreement has changed since 1984.

14

Another case interpreting language in the NALC-USPS National Agreement concluded that the parties expressly intended to restrict attempts to present new evidence for the first time in arbitration. (*See* Case No. N8-W-0406, p. 9 (1981).) Although the APWU-USPS agreement at the time contained provisions similar to those in the NALC-USPS agreement, the language and culture of the two agreements are different. Article 15.2 (Step 3(b) of the USPS-APWU agreement makes clear that each party's advocate is charged with "making certain that all relevant facts and contentions have been developed and considered." (*See* Joint Exhibit No. 1, p. 95.) The Employer also agreed in the APWU agreement that its Step 3 decision must include "the reasons for the decision in detail and shall include a statement of any additional facts and contentions not previously set forth in the record of the grievance as appealed from Step 2." (*See* Joint Exhibit No. 1, p. 95.) But in Step 4 of Article 15.2, the parties to the USPS-APWU agreement may return to Step 3 a dispute where "all relevant facts" have not been adequately developed. At Step 3, the parties may return to Step 2 disputes where not only relevant facts but also "contentions" were not adequately developed.

Did the parties in the USPS-APWU agreement intend more flexibility at Step 4 than might be the case for other steps in the procedure or under other contracts, or is it an inadvertent gap in their agreement? The

15

parties also decided in the USPS-APWU agreement that a decision at Step 4 "shall include an adequate explanation of the reasons therefor." (*See* Joint Exhibit No. 1, p. 98.) The parties chose not to track the language of Step 3 and did not require that a Step 4 decision "state the reasons for the decision in detail and ... include a statement of any additional facts and contentions" not previously set forth in the record. (*See* Joint Exhibit No. 1, p. 95.)

The point of this litany is to show that earlier decisions are not dispositive of the issue submitted to the arbitrator in the current dispute. Moreover, it previously has been found that, at least under the NALC-USPS agreement, an arbitrator should be permitted to hear some arguments advanced for the first time in arbitration. (*See* Case No. B90N-4B-C 94027390, pp. 8 and 12 (1996).) Such flexibility at the national level recognizes that many lawyers and most labor/management representatives are not expert in drafting formalistic pleadings and that national labor policy favors arbitration, especially in cases of doubtful contract coverage. Such flexibility also avoids inefficient rigidity in the arbitration process once a dispute reaches the national level. The point is that no "bright-line test" exists with regard to the first issue raised by the APWU. A decision needs to be made on a case-by-case basis as to whether or not the bargain of the parties is being evaded and whether or not considering a particular argument will

16

encourage arbitration by ambush. The Union's contention that the arbitrator is without authority to consider the Employer's affirmative defense must be decided based on the specific facts of this case and cannot be resolved merely on the basis of general arbitral precedent, especially when the precedent did not construe this particular agreement.

As Arbitrator Aaron made clear almost two decades ago, the underlying policy objective of rejecting new evidence and arguments at the last step is to encourage early information sharing so that a party may come to arbitration prepared to join issue with evidence and argument submitted by the other side. The APWU failed to be persuasive in its contention that it was unduly surprised by the Employer's affirmative defenses in this case and that it was unprepared to join issue with them. The arbitrator received conflicting evidence with respect to whether management made the Union aware of its affirmative defenses, but the Employer offered the most persuasive evidence. Moreover, the arbitrator was amenable to giving the Union additional time to prepare a defense, if it was needed.

The Employer contended that the Union learned of management's affirmative defenses during settlement talks about the APWU's withdrawing its unit clarification petition. Mr. Guffey, Executive Vice-president, testified he knew about the Employer's defense that, if the

17

AMS Specialists were to be included in the APWU bargaining unit, they should be the subject of an election campaign. (*See* Tr., vol. 2, p. 62.) The evidence failed to be dispositive with respect to a contention that the Union's ability to prepare an adequate response in this case has been or would be substantially prejudiced by the arbitrator's considering the Employer's affirmative defenses. They, accordingly, will be considered by the arbitrator in evaluating the merits of the case, and the affirmative defense of the Employer based on the "historical exclusion" principle of the NLRB will be considered as an aspect of contract interpretation, a topic to be examined later in the report.

### B.    Construing the Intent of the Parties

The Employer rejects the propriety of accreting members to the APWU bargaining unit in this case. In Article 1.1 of the USPS-APWU collective bargaining agreement, the Employer recognized the American Postal Workers Union as the exclusive bargaining representative of those in the appropriate bargaining unit. In Article 1.2, the parties agreed that the APWU bargaining unit does not include:

18

1. Managerial and supervisory personnel;
2. Professional employees;
3. Relevant personnel employees;
4. Security guards;
5. Postal inspectors;
6. Supplemental workers;
7. Rural letter carriers;
8. Mail handlers; or
9. Letter carriers. (*See* Joint Exhibit No. 1, p. 2.)

As the Union sees it, the "AMS Specialist" position is not a part of any excluded category of employees. It logically follows, according to the APWU, that the disputed position is a part of the bargaining unit. It is the position of the APWU that the Employer violated the parties' agreement by treating employees in the "AMS Specialist" position as nonmembers of the APWU bargaining unit.

Collective bargaining agreements contain gaps, as do all contracts. Parties to a collective bargaining agreement are presumed to understand that, unless a negotiated agreement sets forth contrary instructions, gaps in a labor contract will be filled by drawing on established arbitral jurisprudence and the common law of the shop. Parties are presumed to be familiar with this body of arbitral principles and to understand that an arbitrator will draw on it for guidance in construing a collective bargaining agreement. As the late David Feller, past-president of the National Academy of Arbitrators, observed, "There is a whole set of implicit relationships, not

19

spelled out in the agreement, and not confined to any particular employer, which an arbitrator assumes to exist." (*See* 2 Industrial Relations Law Journal 97, 104 (1977).) Parties to collective bargaining agreements understand that arbitrators draw on this deep wellspring of implicit relationships to interpret a labor contract.

Arbitrators have incorporated into their jurisprudence standard common law principles of contract interpretation. As Professor Dennis Nolan observed, "The arbitrator's interpretive tools in resolving a grievance are not limited to the words of the collective bargaining agreement." (*See ADR in the Workplace*, 323 (2000).) Courts share Professor Nolan's conclusion. As stated by the Second Circuit, "Merely because an arbitral decision is not based on the express terms of a collective bargaining agreement does not mean that it is not properly derived from the agreement. An arbitrator is entitled to take cognizance of contract principles of contract interpretation and draw on them for guidance in construing an agreement." (*See Harry Hoffman Printing, Inc.*, 950 F.2d 95, 98-99 (2d Cir. 1991).)

One standard of contract interpretation enjoying wide acceptance among arbitrators is the notion that "the expression of one thing is the exclusion of another." As one scholar observed, "Arbitrators follow an interpretive assumption that if parties specifically enumerated a list of items

20

from a class to which a contractual provision is applicable, they meant to

cover only the specific items listed and to exclude other items of that class

from coverage." (*See* St. Antoine, *The Common Law of the Workplace*, 71

(1998).) Courts use the same standard. Almost four decades ago, the

eminent contract scholar, Professor Edwin Patterson, stated that, "If one or

more specific items are listed, without any general or inclusive terms, other

items although similar in kind are excluded." (*See* 64 Columbia Law Review,

833, 853 (1964); *see* also *Central Hous. Inv. Corp.*, 248 P.2d 866 (1952).)

   Without evidence from the parties on which to base a

conclusion, it is not an arbitrator's role to speculate about the bargain they

struck  but, rather, to read the contract and  implement their intent based on

the objective manifestation of their understanding, as construed within the

context of accepted principles of contract interpretation.  It is logical for an

arbitrator to conclude that parties consciously have chosen not to dispose of a

gap in their agreement or not to resolve a controversy in their relationship by

incorporating specific language to eliminate the dispute because they are

satisfied with general rules of contract interpretation that govern the gap or

controversy, and they have no desire to bargain around established

jurisprudence in order to change the rules.  The dispute before the arbitrator is

not one which the parties could not have foreseen or did not foresee at the

time they entered into the relevant agreement, and their conscious decision

not to confront the issue supports a conclusion that they were satisfied with

the impact of rules of contract law on the problem if the matter came to

arbitration or to a court of law.

The impact of the relevant rule of interpretation in this case is

clear. Article 1.2 of the USPS-APWU labor contract lists types of positions

to be excluded from the bargaining unit. The standard rule of contract

interpretation teaches that any position devoted to performing duties not listed

within the exclusions is a part of the bargaining unit. The "AMS Specialist"

position does not call for workers to perform duties within the exclusions set

forth in the contract. Accordingly, it is reasonable to conclude that the parties

intended the work and the position to be in the bargaining unit.

C.    Teaching of the Law

While an arbitrator's allegiance is to the parties' contract, the

law is not to be ignored. A standard rule of contract interpretation is that a

lawful interpretation is preferred to an interpretation which ignores the law.

(See § 203(a) of *Restatement (Second) of Contracts*, 93 (1981).) Most

22

arbitrators interpret labor contracts within the shadow of the law. To argue that the law is not relevant because the Employer made its assignment of work while focused only on contract interpretation and not on the law misses the point that a standard rule of contract interpretation is to prefer an interpretation consistent with the law. The parties to the USPS-APWU collective bargaining agreement themselves recognized that they implement their agreement within the shadow of the law. For example, the Employer agreed to exercise its managerial rights in a manner "consistent with applicable laws and regulations." (*See* Joint exhibit No. 1, p. 6.) Likewise, the Employer agreed in Article 5 of the parties' agreement to be instructed by the National Labor Relations Act and not to act in a way "inconsistent with its obligations under law." (*See* Joint Exhibit No. 1, p. 8.) The parties themselves recognized the law as a contractual backdrop and saw the importance of using the law as an interpretive guideline to better understand their labor contract.

The relationship between the American Postal Workers Union and the Employer is covered by the National Labor Relations Act. The Act is administered by the National Labor Relations Board, the General Counsel, and regional offices of the Board. The Act requires that an employer bargain collectively with an exclusive bargaining representative selected by a

23

majority of workers in an appropriate bargaining unit. Since a collective

bargaining agreement covers a certain group of workers, the Board has spent

considerable time studying appropriate boundaries of bargaining units. It has

developed a number of helpful guidelines to test the propriety of a particular

bargaining unit, and this body of administrative decisions provides a useful

source of guidance in interpreting contractual provisions in the USPS-APWU

labor contract. Factors used by the Board in its analysis include:

> (1)   Similarity in the scale and manner of determining
>        earnings;
> (2)   Similarity in employment benefits, hours or work and
>        other terms and conditions of employment;
> (3)   Similarity in the kind of work performed;
> (4)   Similarity in the qualifications, skills and training of
>        employees;
> (5)   Frequency of contact or interchange between
>        employees;
> (6)   Geographic proximity;
> (7)   Continuity or integration of production processes;
> (8)   Common supervision and determination of labor-
>        relations policies;
> (9)   Relationship to the administrative organization of the
>        employer;
> (10)  History of collective bargaining;
> (11)  Desires of affected employees; and
> (12)  Extent of union organization.

Not all factors are used in every case, and generally no single factor is

dispositive.

Since 1971 and passage of the Postal Reorganization Act, the National Labor Relations Act has covered employees of the United States Postal Service. It was the intent of Congress that "the judgment as to what will be the appropriate units for collective bargaining in the Postal Service [will be made] on the basis of the same criteria applied by the National Labor Relations Board in determining appropriate bargaining units in the private sector." (*See* Conf. Rep. No. 91-1363, Second Session 81-82 (1970).) Use of NLRB criteria, of course, includes all the uncertainty inherent in using a wide variety of factors. The parties agreed in their National Agreement that management would not affect conditions of employment in a manner inconsistent with guidelines set forth in the Act. Accordingly, it is reasonable to construe the current dispute between the parties in light of relevant guidelines developed by the National Labor Relations Board. Although the arbitration decision is rooted in the parties' contract, it is appropriate to consider relevant interpretive guidance in administrative decisions under the National Labor Relations Act.

An overarching concern of the NLRB is whether employees in an appropriate bargaining unit share a community of interests. Defining an appropriate unit, however, does not mean finding a perfect community of interests. The search is not for the most appropriate unit but only a unit in

which employees share a reasonable community of interests and a unit that

assures employees reasonable freedom to exercise their collective bargaining

rights. (*See, e.g., Morand Brothers Beverage Co.*, 91 N.L.R.B. 409 (1950).)

The National Labor Relations Board even has gone as far as concluding that,

if a union can establish the propriety of an appropriate bargaining unit, it is

unnecessary to evaluate an allegedly better configuration offered by an

employer. (*See, e.g., Dick Contracting*, 209 N.L.R.B. 150 (1988).)

A relevant test in determining the appropriateness of a bargaining unit is to

consider the similarity of the kind of work performed by those who would be

accreted to the unit in comparison with those already in the unit. Such a

comparison in this case supports a conclusion that workers in the "AMS

Specialist" position perform reasonably similar duties to those in the Clerk

Craft. This conclusion is based on comparing position descriptions of the

"Data Collection Technician" and "General Clerk" position with that of the

"AMS Specialist" position.

Duties of the AMS Specialist include (1) collecting and

maintaining address information; (2) checking such information for accuracy;

(3) resolving data discrepancies; (4) transferring data to a database; (5)

maintaining route delivery information; (6) coordinating procedures for

address changes; and (7) providing technical support for the system.

26

(*See* APWU's Exhibit No. 11.)   A Data Collection Technician in the Clerk Craft performs some similar duties, such as collecting data and analyzing information for accuracy as well as for compliance with national programs. (*See* APWU's Exhibit No. 13.)  A General Clerk in the Clerk Craft performs duties such as correcting and maintaining mailing lists, a duty requiring a thorough knowledge of a primary scheme.  (*See* APWU's Exhibit No.14.)  While position descriptions provide a useful source of guidance with regard to basic mail handling and processing functions, they clearly are not dispositive. (*See* Case No. B90N-4B-C 94027390 (1996); and Case No. A-C-N-6922 (1990).)

It should also be noted that  a USPS case in 1990 examined whether or not position descriptions should be dispositive in defining jurisdictional boundaries between supervisors and bargaining unit members. The present dispute involves no such consideration.  Moreover, although position descriptions in this case provide useful information to help define whether the disputed positions involve bargaining unit work, it is primarily the parties' contract that is being used to understand the appropriate configuration of the bargaining unit.  The relevant position descriptions merely confirm a conclusion that disputed work is similar to that performed

27

within the bargaining unit and has not been excluded by contract from the appropriate unit.

Evidence submitted to the arbitrator established that AMS Specialists share a community of interests with the APWU bargaining unit in their skills and qualifications. Mr. Titus, an AMA Specialist in Minnesota, testified that his work requires a knowledge of coding guidelines and that he reviews guidelines so that he knows what to look for when analyzing data. (*See* Tr. vol. 1; p. 303.) An individual is not required to have prior experience with the U. S. Postal Service in order to apply for the position. (*See* Tr., vol. 1, pp. 207-208.) Evidence established that skills of the disputed position are not significantly different from the Data Collection Technician. Both obtain essentially the same sort of training. (*See* APWU's Exhibit No. 14.) A comparison of the two positions suggests that analytical skills based on a knowledge of coding and reviewing relevant guidelines are substantially similar and that, in this regard, both positions share a community of interests.

Bargaining history is also highly significant to the NLRB in defining an appropriate unit of employees. Duties of AMS Specialists historically have been performed by nonbargaining unit employees. But bargaining history is not dispositive where the history is checkered. AMS

28

Specialist Titus testified that he believed no bargaining unit employee ever performed the work of an AMS Specialist. (*See* Tr., vol. 1, p. 305.) Ms. Hawes, from the Office of Address Management, testified that bargaining unit employees performed data entries and conceded that sometimes AMS Specialists performed the same work as well. She maintained, however, that the type of data entry done by bargaining unit members no longer exists and also that work performed by an AMS Specialist is more analytical than the sort of work performed by bargaining unit members. (*See* Tr., vol. 1, pp. 262, 267-268.)

When there is a long, unspotted history of work performed by particular employees either pursuant to a negotiated agreement or by certification of an administrative agency, the work organization should be disturbed by an arbitrator with great reluctance. For example, if there existed a long-standing history that was counterbalanced by other indicia of a community of interests, the long organizational history might be dispositive unless the history were spotty or, perhaps, had not included a successful method of organizing the work. (*See, e.g.,* Case No. A-C-N-6922 (1990); and *Teamsters National UPS Negotiating Committee v. NLRB,* 12 F.3rd 1518 (D.C. Cir. 1994).)

Evidence submitted to the arbitrator established that in the past the work of AMS Specialists has been performed by both bargaining unit and nonbargaining unit employees. Mr. Garner, Customer Service Support Specialist, testified that the "AMS Specialist" position has existed since 1982. (*See* Tr., vol. 1, p. 153.) The initial title of the position was "Address Information Systems Analyst." While management created it as a nonbargaining unit position, clear and convincing evidence established that some of the work of the position occasionally had been performed by bargaining unit employees. Work of the AIS Analyst or the AMS Specialist has been performed by nonbargaining unit employees, but it is clear that the history is checkered and not unbroken. Moreover, the parties' bargaining history with regard to the disputed work has not been predicated on the certification of an appropriate unit by the National Labor Relations Board. As such, bargaining history in this case is not dispositive. (*See, e.g., NLRB v. Porter County Farm Bureau Corp. Association*, 314 F.2nd 133 (C.A. 7, 1963).)

Bargaining history is highly significant in defining a work unit because of an often unstated assumption that it reflects the desires of the employees. In other words, a long, unspotty history of excluding certain employees from a bargaining unit is highly significant based on a theory that

30

disputed employees at some point would have voted to join the bargaining unit if it had been their desire to do so.   A checkered history of the work, however,  complicates that assumption.   Although a checkered bargaining history calls into question the dispositive nature of this particular factor, it is still important to be sensitive to the desires of employees in the disputed positions.  If an analysis of an appropriate bargaining unit suggests that it is in homeostasis, it might be simple to use the "desires of the employees" factor as a crucial tie breaker.  (*See, e.g., Globe Machine and Stamping Co.,*3 N.L.R.B. 294 (1937).)  But no tie breaker exists in this case.

        The *Globe* Doctrine  is not dispositive in this particular dispute because of the Union's unrebutted evidence that, when management created the "AMS Specialist" position and assigned the work outside the bargaining unit, the American Postal Workers Union received no adequate opportunity to object to the Employer's organizational design.  Mr. Guffey, Executive Vice-president of the APWU, testified without rebuttal that management never informed the Union of its placement of the disputed work outside the bargaining unit when the Employer created the position.  (*See* Tr., vol. 2, p. 67.)  Moreover, Mr. Almirall, Customer Requirements Analyst, testified that it is not a standard practice of management to inform the Union when a

31

position is assigned outside the bargaining unit. (*See* Tr., vol. 2, p. 25.) Yet, the parties agreed in Article 1.5.A that:

> Each newly created position shall be assigned by the Employer to the national craft unit most appropriate for such position within thirty (30) days after its creation. Before such assignment of each new position the Employer shall consult with the Union signatory to this Agreement for the purpose of assigning the new position to the national craft unit most appropriate for such position. (*See* Joint Exhibit No. 1, p. 3, emphasis added.)

Moreover, the Employer promised to notify the Union promptly "regarding assignments made under this provision." (*See* Joint Exhibit No. 1, p. 3.) Without notice from the Employer, the APWU has no way of protecting its contractual rights if it is not made aware that management has made an assignment outside the bargaining unit.

On learning of management's decision to assign the work outside the bargaining unit, the Union not only did not acquiesce but objected to the placement and filed grievances to challenge the Employer's decision. The complaints became snarled in the parties' grievance system, and the Union in 1992 filed an Unfair Labor Practice charge that challenged the assignment of allegedly bargaining unit work to nonbargaining employees. (*See* Tr., vol. 2, pp. 60, 61 and 76). Moreover, Mr. Guffey, Executive Vice-president, testified that the Union could not file a national level grievance until a 1990 arbitration decision opened the system to such a grievance. (*See*

Case No. A-C-N-6922 (1990).) The Union, however, did not immediately

file a national level grievance in this matter. The Employer also points out

that the Union failed to object at the bargaining table to management's

decision with regard to the disputed position. Such evidence diluted the

Union's assertion that it had no opportunity to challenge management's

decision with regard to the "AMS Specialist" position. At the same time, the

evidence established that the APWU clearly did not acquiesce with the

Employer's decision to assign the work of AMS Specialists outside the

bargaining unit. Moreover, the evidence is compelling that the APWU did

not initially challenge the decision because management did not inform

APWU officials of the disputed placement.

While NLRB guidelines and judicial decisions are instructive,

the parties' collective bargaining agreement ultimately is dispositive. Article

1 of the agreement between the Employer and the APWU recognizes the

APWU as the exclusive bargaining agent "of all employees in the bargaining

unit for which each has been recognized and certified at the national level."

(*See* Joint Exhibit No. 1, p. 1.) Rather than defining an appropriate

bargaining unit or determining the jurisdiction of a bargaining representative,

this contractual provision acknowledges that the APWU has been recognized

by management as the bargaining agent for those in the appropriate unit.

33

(*See* Case No. H4C-4C-C 23981 (1985).)  The Employer argues that, because the "AMS Specialist" position did not exist in 1971, it clearly was not part of the bargaining unit the APWU is certified to represent, and management believes it would inappropriately expand the Union to add the position at this late date.  Such an analysis, however, gives short shrift to Article 1.2 of the parties' negotiated agreement.

Article 1.2 of the National Agreement sets forth exclusions.  It enumerates nine categories of employees who are excluded from the APWU bargaining unit.  The parties are sophisticated negotiators with a long collective bargaining history, and they knew or are presumed to have known that, by listing exclusions from the bargaining unit, they were announcing that anything not excluded was to be included.  To argue that, because the disputed position did not exist, it could not been covered by the contract provision on exclusions is to ignore the totality of the parties' agreement  As the parties well understand, an agreement is interpreted as a whole document.  Article 1.5 of the Employer's agreement with the APWU makes clear that new positions must be assigned to the most appropriate craft.  In view of the fact that the disputed work is not excluded under exceptions listed in Article 1.2 of the APWU-USPS agreement, the Employer bound itself to assign the work to the most appropriate craft, namely, the Clerk Craft.

34

The Employer argued that, even though some of the data entry work had been performed by bargaining unit members in the past, AMS Specialists constitute a separate unit of workers. In the view of the Employer, interests of AMS Specialists are not submerged within those of existing bargaining unit members. The Employer argues that, only if AMS Specialists have an opportunity to resolve the representation issue for themselves, should they be included in the APWU bargaining unit.

To accept the Employer's theory of the case, however, requires a decisionmaker to ignore the bargain struck by the parties in their collective bargaining agreement. In other words, the Employer's theory would authorize management to create any position that does not narrowly fit into exclusions set forth in Article 1.2 of the parties' agreement and to assign the work outside the bargaining unit. If the Employer continued its practice of not informing the APWU of the work assignments, the Union would not be in a position to object until by happenstance it learned of management's acts. At that point, the Employer again would be in the position of wanting to argue that a disputed position historically had been excluded from the bargaining unit. In this case, however, management failed to prove that AMS Specialists enjoy an identity as a self-contained, homogenous group of employees, separate and distinct from the APWU bargaining unit employees. Evidence

35

submitted to the arbitrator showing a sufficient community of interests with the APWU unit failed to justify a smaller unit of only AMS Specialists. As the Ninth Circuit pointed out long ago, these are decisions that must be made on a case-by-case basis and must take into account "the entire congeries of facts in each case." (*See NLRB v. Food Employer Council, Inc.,* 69 LRRM 2077, 2080 (9th Cir. 1968).) The totality of the record in this case favors including the disputed positions in the APWU work unit.

It is recognized that in Article 3(B) of the USPS-APWU National Agreement, management retained the right to assign work, but it is not an unfettered right. The Employer agreed to assign work subject to the provisions of the parties' negotiated contract. In Article 1.2 of the parties' agreement, the Employer recognized the APWU as the exclusive representative for employees unless the employee group fell into one of the excluded categories. The Employer limited its managerial right to assign work to whatever group of employees it prefers. Flexibility is important in this area of the parties' relationship, and the congeries of facts in this particular case favor an appropriate bargaining unit that includes AMS Specialists.

36

## AWARD

Having carefully considered all evidence submitted by the parties concerning this matter, the arbitrator concludes that the "Address Management System Specialist" position is a part of the APWU bargaining unit and that it is a violation of Article 1.2 of the National Agreement to exclude the position and the disputed work from the bargaining unit. The arbitrator shall retain jurisdiction in this matter for ninety days from the date of the report in order to resolve any problems resulting from the remedy in the award. It is so ordered and awarded.

Respectfully submitted,

Carlton J. Snow
Professor of Law

Date    April 29, 2003

37