INTEREST ARBITRATION

```
- - - - - - - - - - - - - - - x
                              :
UNITED STATES POSTAL SERVICE  :
                              :
        and                   :
                              :
AMERICAN POSTAL WORKERS UNION : Case No.
(AFL-CIO)                     : Q94C-4Q-C 98117564
                              :
        and                   :
                              :
NATIONAL ASSOCIATION OF       : VOLUME II
LETTER CARRIERS (AFL-CIO)     :
                              :
- - - - - - - - - - - - - - - x
```

United States Postal Service
North Building, Room 1P 629
475 L'Enfant Plaza, S.W.
Washington, D.C.

Tuesday, July 23, 2002


        The ARBITRATION in the above-entitled matter

resumed for hearing at 10:10 a.m., pursuant to recess,

before:

        CARLTON J. SNOW, Arbitrator

**Diversified Reporting Services, Inc.**
1101 Sixteenth Street, NW  Second Floor
Washington, DC  20036
(202) 467-9200

2

APPEARANCES:

On Behalf of the United States Postal Service:

    HOWARD J. KAUFMAN, ESQ.
    JAMES DIXON, Labor Relations Specialist
    United States Postal Service
    475 L'Enfant Plaza, SW
    Washington, D.C.  20260-1150

On Behalf of the American Postal Workers Union:

    MELINDA K. HOLMES, ESQ.
    O'Donnell, Schwartz & Anderson, P.C.
    1300 L Street, N.W., Suite 1200
    Washington, D.C.  20005

    PATRICIA WILLIAMS, Assistant Director,
        Clerk Division
    STEVEN G. RAYMER, Director, Maintenance
        Division
    American Postal Workers Union
    1300 L Street, N.W.
    Washington, D.C.  20005

On Behalf of the National Association of Letter
Carriers:

    ALAN APPLEBAUM, Contract Administration Unit
    National Association of Letter Carriers
    100 Indiana Avenue, N.W.
    Washington, D.C.  20001-2144

                    *  *  *

3

# C O N T E N T S

| WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Thomas Almirall | 8 | 23 | 41 | 43 |
| Clifford J. Guffey | 61 | 71 | | |
| Anton Hajjar | 99 | 100 | | |

| EXHIBITS: | IDENTIFIED | RECEIVED |
|---|---|---|
| USPS: | | |
| No. 23 - Step 4 Decision | 5 | 5 |
| No. 24 - Case Law | 5 | 5 |
| No. 25 - Case Law | 5 | 5 |
| No. 26 - Meeting Notes | 41 | 41 |
| APWU: | | |
| No. 15 - Deferred charge | 89 | 108 |
| No. 16 - Collyer letter | 89 | 108 |
| No. 17 - Legislative history | 89 | 97 |
| No. 18 - Legislative history | 89 | 97 |
| No. 19 - Legislative history | 89 | 97 |
| No. 20 - Legislative history | 89 | 97 |
| No. 21 - Legislative history | 89 | 97 |

4

1            P R O C E E D I N G S

2            ARBITRATOR SNOW:  All right.  Let me call to

3    order this arbitration between the United States Postal

4    Service and the American Postal Workers Union, with the

5    NALC as Intervenor.

6            It is my understanding, Mr. Kaufman, that you

7    have a few additional exhibits to introduce?

8            MR. KAUFMAN:  And one witness.

9            ARBITRATOR SNOW:  And a witness?  All right.

10   And then we will move to any comments that you have.

11           Any other preliminary matters we need to

12   consider before moving forward in this second day?

13           MS. HOLMES:  Well, if I may, let me just

14   remind and renew of our standing objection regarding

15   the Postal Service's case.  You recall that we had

16   some -- sorry, the microphone bounced -- significant

17   discussion and argument at our last hearing about the

18   Postal Service's -- their admitted failure to respond

19   in the grievance procedure to the grievance that we are

20   arbitrating in our position that, Arbitrator Snow, that

21   you should preclude them from presenting a case or at

22   this stage considering their case, since they have

23   chosen not to engage otherwise in the grievance

58

1    validity of his award.  So we will save that for our

2    brief to address.

3           And I would like to call Mr. Guffey to the

4    stand.  And actually, let me pass these down so he

5    has --

6           ARBITRATOR SNOW:  If I recollect, you were

7    sworn at the earlier hearing, Mr. Guffey?

8           MR. KAUFMAN:  No, no.  They presented no

9    witnesses previously.

10          ARBITRATOR SNOW:  You're correct.  You're

11    correct.

12    Whereupon,

13                 CLIFFORD J. GUFFEY

14    was called as a witness and, having been first duly

15    sworn, was examined and testified as follows:

16          ARBITRATOR SNOW:  Give us your name, please,

17    sir, and spell your last name.

18          THE WITNESS:  My name is Clifford J. Guffey,

19    G-u-f-f-e-y, executive vice president of the APWU.

20          MS. HOLMES:  And I have passed down to

21    Mr. Guffey our exhibit book that we put in last time so

22    he can refer to a couple of exhibits there, and also

23    Postal Service Exhibit 23.  Is that right?  Is that the

59

1    right number on that?  I don't have it in front of me

2    now.

3                    DIRECT EXAMINATION

4         BY MS. HOLMES:

5         Q    Mr. Guffey, could you briefly recount for us

6    the national offices that you have held with the

7    American Postal Workers Union?

8         A    Local president until -- from '78 to '86.  '86

9    to about '97, I was assistant clerk craft director.

10   From '98 through 2001, I was director of the clerk

11   division.  And now I'm the executive vice president.

12        Q    Thank you.  And, now, were you involved as an

13   officer of the APWU with the unit clarification case

14   that we've been referencing?  It's 5-UC-353.

15        A    Yes.

16        Q    And I have it as Postal Service Exhibit 1, if

17   anyone needs to refer to it.

18             How were you involved in that case?

19        A    Basically, the EAS issues of the EAS employees

20   performing work that I thought should be done inside

21   the craft has been one of my issues for many years.

22   And I sought a different way to approach it since I

23   could not get the cases forward in arbitration.  And

60

1  because they had been delayed for so long, I was just

2  looking for a different way to approach the situation.

3  So yes, I got the attorneys involved and had the

4  attorneys find a way to get in front of the NLRB, file

5  the unit clarification, and then we had -- I believe we

6  had my boss at that time, who was Bob Tunstall, sign

7  the petition.

8       Q    And were you involved in the settlement that

9  came out of that case?

10      A    Yes.

11      Q    And I'd refer you to -- it's Exhibit 1 in that

12  black binder in front of you.  Can you tell us briefly

13  why the Union agreed to settle its UC petition in this

14  manner?

15      A    Well, again, I principally wanted to have all

16  the cases heard in arbitration as fast as I could, and

17  I just was going nowhere.  For the first eight years I

18  was in office, I don't think we even had a case heard,

19  and we were barred for almost ten years from doing any

20  of these cases based on a previous national award by

21  Arbitrator Gamser, National Case 64, which said we

22  could not go forward with any of these EAS-type cases

23  until the decision in 6922 was rendered, which

61

1    Arbitrator Snow didn't render until the early '90s.  So

2    we were barred from '86 to '90 from even doing any of

3    these EAS cases.

4          And I was wanting to do these cases.  We

5    finally got one case in front of Arbitrator Snow on

6    personnel, and then after that decision got nothing for

7    several more years.  So we were looking for a way and a

8    means to getting the cases heard, so we filed the UC.

9          Now, we felt like the forum of arbitration was

10   the better forum for us to make the arguments because

11   we had cases filed, and for a lot of different reasons,

12   we just decided this would be the best way to go.

13   Q    You have the settlement agreement in front of

14   you, and it's clear on its face.  Does it say, though,

15   that the parties would arbitrate the unit clarification

16   petition?

17   A    No.  We agreed to arbitrate specific cases

18   that we had filed.

19   Q    And these were grievances?

20   A    These were grievances that were filed at the

21   national level.

22   Q    Does the settlement agreement anywhere waive

23   the grievance procedure for those grievances that --

1          A     There was no intent on our part to waive

2     anything on the grievance procedure.  And there's

3     nothing in the document that says anything is waived.

4          Q     Now, to the best of your recollection, did

5     anyone from the Postal Service ever state what the

6     Postal Service's conclude defenses were to the instant

7     grievance that we're looking at today?

8          A     No contractual defenses.  I have heard what

9     was stated by management's advocate today in the past,

10    where these people could be organized, you know, if we

11    wanted to go out and organize them.

12          The problem is, like I say, they should have

13    been placed in the unit when they were first created.

14    They should not have been hired into non-bargaining

15    unit positions.  That's our belief.

16          The historical concept of our contract goes

17    well beyond of writing -- having exclusions.  Everyone

18    is in except certain people.  That's the historical

19    application of our contract.  And when you go back to

20    the early '70s when the contract -- first contract was

21    signed in '71, the parties began placing jobs that had

22    been outside the unit back into the unit.

23          And I'm talking things like civil service

63

1    examiner.  A new title was created, and they put it in

2    the unit.  There were a lot of training-type jobs that

3    were outside the unit; then they were put back into the

4    unit because they were going along with the language.

5        In the mid-70s came what they called the JEP

6    program, the job evaluation program, which we were

7    participating.  And then we quit participating for

8    certain reasons and began arbitrating the cases, and

9    along was filed the Case 6922 in the late '70s saying

10   what was bargaining unit work under the Article 1.6 --

11   solely under 1.6, what was bargaining unit work.

12       And as I said, that was in front of Gamser.

13   And Gamser also did National Case 64 that's precluded

14   us from doing any EAS-type work.  There was a job --

15   there was a case filed in the '80s, early '80s, 1980,

16   that became National Case 64 that was specifically

17   about none of these non-bargaining unit jobs that was

18   not supervisory or managerial.  And they said we

19   were -- the Post Office argued we were precluded from

20   going forward until 6922 was completed.  And Arbitrator

21   Gamser agreed with that.

22       So we wee barred from the mid-70s all the way

23   until you rendered your decision in I think it was '90,

64

1    probably around 1990, from going forward with anything.

2    And, you know, our system is what our system is.  I

3    mean, it's just a slow process, but it's the only

4    process we've got.

5          And we're here in front of you today trying to

6    enforce our Article 1, Section 2 as it was originally

7    written and not based the historical application of

8    what happened while we were barred from going forward

9    and fighting under Article 1, Section 2, from the

10   mid-70s through 1990.  A lot of things could happen in

11   those 15, 17 years, but we were barred from going.

12        Q    Now, you have in front of you Postal Service

13   Exhibit 23, which Mr. Kaufman put into evidence today

14   related to one of many grievances having to do

15   specifically with the address management system and

16   that related work.

17          Could you explain about this document and what

18   the issue was in that particular case?

19        A    Mary Burrell, I remember her pretty well

20   because we talked to her several times, even before

21   this got to step 4.  And she was a clerk in Tampa that

22   was performing the data input and doing the things

23   as -- I believe as a general clerk at that time, and

1    doing the work in the address information system.   And

2    at a certain point, then she had to train an EAS

3    employee to do what she was doing, and then she was

4    moved out of that area.

5         The problem we have with this -- and I'm going

6    to state this as clearly as I can, Andersen, and maybe

7    you've probably heard me say this before -- the Postal

8    Service states what our position is, and they say

9    that -- and that these duties belong exclusively to the

10   bargaining unit.   It's not our position.   It's never

11   been a position I've expounded.   And it's just a

12   mischaracterization of what we say.

13        You gave us a decision in 6922, say, on

14   answering the telephone.   Answering the telephone or

15   some timekeeping is duties that anyone can do, a duty.

16   But once there's enough of that work, say, answering

17   the phone, where's someone assignment is to do, say,

18   two, three, four hours of answering the telephone, that

19   assignment then, because it meets the guarantee,

20   becomes an assignment within our contract and must be

21   posted to our people under our contractual rights to

22   seniority to the job.

23        In other words, yes, management can answer the

1    phone. A letter carrier can answer the phone. But

2    once the assignment is, say, answering the phone for

3    six or seven hours and giving information over the

4    phone, that's an information clerk position and that

5    assignment -- not the duty, the assignment -- belongs

6    to the employees.

7         Address information specialist, some of these

8    duties we're talking about, there's a lot of work that

9    carriers do, and they fill out their forms for their

10   own routes and they send it in, and then someone puts

11   that into the computer. We're not contesting what the

12   letter carriers do.

13        We wouldn't contest it if, say, a form comes

14   down and a supervisor -- that was one form, and the

15   supervisor puts in that one form, two forms, ten

16   minutes a day. You know, when you're looking at it,

17   you're looking at de minimis anyhow.

18        But once the work becomes an assignment where

19   it's six, seven, eight hours a day of doing non-

20   supervisory, non-managerial work, we say that's an

21   assignment. It's got to be -- it's a new job. It's

22   work. It's a job. It's got to be given under

23   Article 1, Section 5, to some craft.

**Diversified Reporting Services, Inc.**
1101 Sixteenth Street, NW  Second Floor
Washington, DC  20036
(202) 467-9200

67

1          They could -- you know, they can't just say,
2    oh, this is -- we're giving this to a craft that could
3    be organized, and that's what the Post Office is trying
4    to say.  Oh, it could be organized, so we can put this
5    work someplace that could be organized.

6          Article 1.5 is very clear:  When they create a
7    new position, it's got to be -- if it's not excluded
8    under 1.2, it's got to be awarded to one of the
9    original crafts.  And for them to say that, oh, because
10   it historically had this out during this long period of
11   time, they don't have to put it into a craft, a new
12   position, we say that all jobs that are created have to
13   be awarded -- that are not excluded through 1.2 have to
14   be assigned to a craft under 1.5 so it can be
15   challenged by all the crafts.

16         We heard the testimony from the manager here
17   today that says they create some of these new jobs and
18   they decide it's not bargaining unit so they don't even
19   tell us.  And if half these jobs creep up where you
20   don't even know what's going on out in the field
21   sometimes -- it might slowly evolve -- that's just a
22   wrong principle.

23         The principle of our contract is, they create

68

1    a new job, it's nonsupervisory, nonmanagerial, it

2    doesn't meet the exclusions, it has to be placed under

3    1.5 to one of the crafts. And then the other crafts

4    have the right to challenge that placement.

5         Now, all of our meetings that we met with the

6    Postal Service, this is one argument we've heard. Oh,

7    it's going to be an organized craft. Well, that tells

8    you right off it doesn't meet supervisory or

9    managerial.

10        And we've asked repeatedly at all these

11   meetings, where is the exclusion? What exclusion do

12   they meet? And if you've looked at the minutes that

13   was provided from that April 23rd meeting, which was a

14   meeting that was six or seven months prior to this case

15   even being filed, there's no answer in there why these

16   jobs are out.

17        At that meeting, the only thing that we were

18   told why the -- Mr. Merrill -- what is his name?

19   Q    Almirall.

20   A    -- Almirall stated at that meeting that the

21   only reason that these were being placed out, not

22   because they met the exclusions, but because they were

23   more complicated or they felt like they were more

69

1    technical than what should be in the bargaining unit.

2         And I think even if you look at some of those

3    minutes, you can see where we stated in there, well,

4    we've got data collection technicians.  We have all

5    kinds of technical jobs, ETs and different things,

6    inside the Post Office.  So how are these so technical

7    that they can't be in?

8         We never got a response.  We've never gotten a

9    response in any forum other than the fact, oh, well,

10   you guys could go organize these people.  Well, under

11   our contract, we believe that they had to be placed in

12   one contract or the other.

13        We have a negotiated bargaining unit, a

14   negotiated bargaining unit that the Postal Service has

15   agreed to.  And they agreed to Article 1.2, and they

16   agreed to Article 1.5.  And for them to find some

17   reason outside of 1.2 and 1.5 to place these jobs

18   outside the bargaining unit, we're saying that's wrong

19   and that's why we're asking you to remedy our case.

20        Q    Let me ask you, Mr. Guffey, data entry work,

21   is that bargaining unit work?

22        A    Yes.  Clearly.

23        Q    Which bargaining unit?

1          A    It's clerical, APWU bargaining unit clerical.

2               MS. HOLMES:   I don't have any other questions

3     for Mr. Guffey.

4               MR. KAUFMAN:   I've got a few.

5                         CROSS-EXAMINATION

6          BY MR. KAUFMAN:

7          Q    The last question, you said, is data entry

8     work exclusive bargaining unit work, APWU bargaining

9     unit work?  Yes or no?

10              MS. HOLMES:   Mr. Kaufman, please allow the

11    witness to answer.

12              MR. KAUFMAN:   Well, I think the question can

13    be answered yes or no.

14              THE WITNESS:   If it's performed in a non-

15    bargaining unit facility, it's not our work.   If you

16    have data entry inside this building, we do not

17    represent this building and it's not our work.   It's

18    not a yes or no.   It's not black and white.   It depends

19    on what the contract says in a given issue.

20              BY MR. KAUFMAN:

21         Q    So any data entry performed in a -- where an

22    APWU worker is you claim is your work?

23         A    What I am saying is any assignment that

1    contains the work of data entry in such a manner that

2    would comport to the job description to become an

3    assignment, where that would fall within that position

4    description, would be our work.

5         Now, de minimis type work, I've already stated

6    in this form here that a supervisor -- if a card was

7    sent in by a letter carrier to a supervisor and the

8    supervisor entered one or two cards, that's not a cause

9    for us to grieve or anything.

10        If an assignment is big enough to meet within

11   our position descriptions, yes we'd say it's ours.

12   We'd say data collection, if it's an eight-hour

13   assignment, a six-hour assignment, a four-hour

14   assignment, we'd say, yes, that is our work.  It's not

15   exclusively ours, but if it becomes enough work to be

16   an assignment, then under our contract it would have to

17   be given to our people under 7.2.

18        Q    Now, Cliff, do you understand the

19   difference -- and I don't know if you do, but tell me

20   if you do -- the difference between either supervisors

21   or other non-APWU employees doing bargaining unit work

22   versus jobs that should be in the bargaining unit?  Do

23   you understand the difference?

72

1          A    I don't understand your question.

2          Q    Do you understand the difference?

3          A    I have to understand your question before I

4     give you a --

5          Q    Is there a difference between jobs that belong

6     in the bargaining unit versus employees, non-APWU

7     employees, doing what you believe is bargaining unit

8     work?  Do you understand --

9          A    Are you talking about casuals?

10         Q    No.  I'm not talking about casuals.

11         A    Well, I've got to understand -- I don't

12    understand your question, Howard.

13         Q    Well, EAS -- do you understand the difference

14    between EAS employees doing bargaining unit work versus

15    an argument that EAS jobs belong in a bargaining unit?

16    Do you understand the difference?

17         A    Okay.  I understand the difference, yes.

18         Q    What is your understanding?

19         A    Okay.  Let's say -- number one, our position

20    is no EAS employees are proper except supervisors and

21    managerial employees.  And the third category of EAS

22    employees that's proper are casuals because casuals are

23    EAS employees also.

1          Those three types of employees, supervisors

2     can perform bargaining unit work under the limitations

3     of Article 1, Section 6. Casuals can perform

4     bargaining unit work under the limitations of

5     Article 7. Now, we're saying EASs should not exist

6     that are not supervisors, managerials, or casuals in a

7     postal installation that's covered by our contract.

8          Now, if this arbitrator says, yes, you can

9     have these EAS people outside the craft in these

10    installations, and let's just say the EAS job was

11    created for, say, OPTO in Norman, Oklahoma, and that

12    EAS job, because our contract does not -- that

13    contract -- our contract does not cover Norman,

14    Oklahoma, that EAS job that's created for Norman,

15    Oklahoma might say, "Sets all the clocks in the

16    building for six hours a day and distributes the mail

17    to all the proper offices."

18         Now, that would be a proper EAS job

19    description in Norman, Oklahoma. Now, when that --

20    that job description, then, if you try to use it and

21    say, a general mail facility that is covered by our

22    contract, I'm sure the clerks right off would say, you

23    have no right to have this EAS employee perform the

74

1    distribution.  That distribution belongs to us.

2        Q    Now, Mr. Almirall testified about unions, and

3    I assume he was including the APWU, periodically asking

4    for position descriptions.  Has your union asked for

5    that over the years?

6        A    My knowledge, in the 16 years in the clerk

7    craft, 15 years in the clerk craft, is we asked for

8    them one time, and I think we got them about 14 months

9    after we asked for them.  And that's the only time we

10   ever asked for them.

11       Q    When did you ask for them?

12       A    This had to be right around -- probably '92,

13   about the time all this was surfacing, the change in

14   the -- what do you call it? -- reorganization.

15       Q    Well, you gave some general language to how

16   you were barred from filing this or filing that.  Were

17   you ever barred from filing a UC petition?

18       A    I don't know that I've ever been required to

19   file a UC petition.

20       Q    No.  That isn't -- there's a difference

21   between required and barred.  Were you ever barred from

22   filing a UC petition?

23       A    Only by lack of knowledge.  I didn't know.

**Diversified Reporting Services, Inc.**
1101 Sixteenth Street, NW  Second Floor
Washington, DC  20036
(202) 467-9200

75

1     Q   Well, I'm talking about the APWU.  I'm

2  assuming you're not a lawyer and you're not that

3  familiar with all the nuances.  Was the APWU ever

4  barred from filing a UC petition?

5     A   I don't know that there ever a bar.

6     Q   And you have counsel, don't you?

7     A   Yes.

8     Q   And you have counsel that even worked for the

9  National Labor Relations Board, didn't you, at one

10  time?

11     A   Yes.

12     Q   Did you ever file a UC petition claiming that

13  the EAS-15 analyst positions which are under discussion

14  in this case are part of the bargaining unit?

15     A   Well, I'm sure it's probably one of those that

16  was listed in the UC case.

17     Q   So prior to 1997, you never filed a unit

18  clarification petition concerning this job, did you?

19     A   No.  We have grievances in.  We thought we

20  could get them through the grievance procedure.

21     Q   All right.  And were your grievances

22  concerning that these were bargaining unit jobs, or

23  managers were doing bargaining unit work?  Do you

76

1    understand the difference?

2        A    Yes, I do.  Very clearly I understand the
3    difference.

4        Q    All right.  And what were your grievances?

5        A    The grievances were filed multiple ways.
6    Because Arbitrator Gamser in his National Case 64
7    treated these EAS people under the 1.6 clause, said he
8    thought -- in other words, the arbitrability argument
9    came before it was fully explored.  And he ruled that
10    we could not go forward with this type of case -- I
11    think most of our people filed a lot of these cases
12    under 1.6.

13        After I started teaching how to file these
14    cases, I filed one in Oklahoma City prior to becoming a
15    national officer under Article 1, Section 2.  And when
16    I came to Washington and started pushing the issues in
17    the late '80s and early '90s I started instructing
18    people to file the cases under Article 1, Section 2.

19        We're saying, hey, there's no provision to
20    allow these people to do our work, or to even be in the
21    postal facility doing work.

22        Q    Now, let's go back to the settlement agreement
23    which you discussed.  Do you have it in front of you?

1       A    Yes.

2       Q    Turn to page 2.  Okay?  Did the APWU ever

3    withdraw any of the grievances?

4       A    Yes.  We've withdrawn lots of grievances.

5       Q    Did you withdraw the grievances that were the

6    subject of the settlement agreement?

7       A    I know we've withdrawn a lot of grievances for

8    it, yes.

9       Q    I know you --

10      A    I know we've withdrawn a lot of the personnel

11   cases.  I know I worked with Pat identifying a lot of

12   cases that had to be withdrawn.  And I know we've

13   withdrawn a lot of --

14      Q    Well, let's talk about the AMS case.  Have you

15   withdrawn any of the grievances on the AMS?

16      A    I don't know.

17      Q    You have no knowledge?

18      A    I have no knowledge.

19      Q    Could you check records at some point in time?

20

21      A    If they're sitting there -- do what?

22      Q    Could you check your records?  Do you have

23   records at headquarters that would state whether you've

1    withdrawn the grievances or not?

2           MS. HOLMES:  I'm sorry, Mr. Kaufman.  Are you

3    asking him right now or --

4           BY MR. KAUFMAN:

5    Q    Not right now, but do you have records in

6    your --

7    A    I'm sure we could -- I'm sure I can probably

8    find some that have been withdrawn, and probably there

9    are some that slipped through the cracks, too.

10   Probably both ways.

11   Q    But the question was, do you have records at

12   APWU facilities that would show whether the grievances

13   were withdrawn or not?

14   A    Just the same as the Postal Service would have

15   those records.

16   Q    I asked you, does the --

17   A    Yes.  We have them and you have them.

18   Q    All right.  That's all I asked.  That's all.

19         Now, how long have you been involved in

20   national negotiations?

21   A    Since '86.

22   Q    Since '86?  So you've been involved in the '87

23   negotiations, '87 through '90 contract?

1      A    Yes.

2      Q    And '90 through whenever it was?  Three or

3  four --

4      A    Different parts of the contract at different

5  points.

6      Q    Three of four collective bargaining

7  agreements?  Is that a rough estimate?  Did the Union

8  ever propose that the AMS employees become part of the

9  bargaining unit during our collective bargaining

10  negotiations from at least the period of time that you

11  were involved in, 1986 on to the present?

12      A    I don't believe there was any need for them to

13  ask to be in.  We believe that they're supposed to be

14  in by the current contract.

15      Q    Did you ever make a proposal in 1987?

16      A    Not that I know of.

17      Q    1990?

18      A    Not that I know of.

19      Q    Any years subsequently?

20      A    We had a proposal in this time trying to

21  eliminate the problems that go into arbitration of all

22  these things.  You know, we put it in as a

23  clarification.

**Diversified Reporting Services, Inc.**
1101 Sixteenth Street, NW  Second Floor
Washington, DC  20036
(202) 467-9200