UNITED STATES OF AMERICA
BEFORE THE NATIONAL LABOR RELATIONS BOARD

UNITED STATES POSTAL SERVICE AND JOINT EMPLOYERS[1]
Employer

and Case 5-UC-374

AMERICAN POSTAL WORKERS UNION,
AFL-CIO, CLC
Union-Petitioner

**DECISION AND ORDER DISMISSING PETITION**

On October 23, 2000, the American Postal Workers Union (herein Petitioner, Union or APWU) filed the instant unit clarification petition under Section 102.61(e) of the National Labor Relations Board's Rules and Regulations, Series 8, as amended, and Section 101.17 of the Board's Statements of Procedures. The Union seeks to include two groups of employees within the existing unit covering employees performing programming and analysis work at Information Technology/Accounting Service Centers of the United States Postal Service (herein Postal Service or Employer). The two groups sought to be clarified into the unit are: 1) individuals hired into Executive and Administrative Service (EAS) positions;[2] and 2) contract employees of ten alleged separate joint employers.[3]

---

[1] The Joint Employers named in the petition by the Union are: PRC Inc., Amdahl Corporation, DMR Consulting, GE Capital IT Solutions, Oracle, Anderson Consulting, International Business Machines 1250 East, EDS, Information Builders, and Manpower International.

[2] These positions include EAS Level 23, Business Systems Analysts; EAS Level 21, Community Facility Technicians; EAS Level 21, Computer Performance Specialists; EAS Level 19 and 21, Local Area Network Administrators; EAS Level 16, Information System Security Specialist; EAS Level 17, Management Analyst; and certain EAS Customer Support and Accounting Services Positions. All non-bargaining unit positions, with the exception of high-ranking executives are placed in the EAS series.

[3] The Postal Service contracts with several companies to provide temporary workers to the IT/ASCs. According to Petitioner, PRC, Inc. supplies approximately ninety percent (90%) of these contract employees to the Postal Service. The petition states that other companies which provide temporary workers to the IT/ASCs, include but are not limited to, Anderson Consulting, Amdahl Corporation, IBM, DMR Consulting, EDS, GE Capital IT Solutions, Information Builders, Oracle, and Manpower International. By letter dated November 16, 2000, GE Capital IT Solutions advised Petitioner that it no longer employs anyone working at the sites listed in the petition, and that it should be dismissed from these proceedings.

Pursuant to the provisions of Section 3(b) of the Act, the Board has delegated its authority in this proceeding to me. Based on my investigation and the following facts, I dismiss the Union's petition for the reasons set forth below.

## I. PROCEDURAL BACKGROUND[4]

In 1974, in Case 2-RC-16198(P), the APWU was certified to represent a unit of approximately 1600 employees at six Postal Data Centers (PDCs), including computer systems analysts, computer programmers and computer systems operators. The Union agreed to exclude certain programmer and analyst duty assignments located at Postal Service headquarters. At this time, contract workers were not performing unit work, and most contract work was performed at Postal Service headquarters.

In 1977, in Case 14-RC-8515(P), the APWU was certified to represent all employees (approximately 60) in the Automatic Data Processing Centers (ADPCs) in St. Louis, Missouri and Wilkes Barre, Pennsylvania, and at associated Teleconcentrator Sites in San Francisco, California, Chicago, Illinois, and Oklahoma City, Oklahoma; excluding computer systems analysts, computer program software specialists, communication software specialists, and certain other exclusions.

In 1979, in Case 17-RC-8731(P), the APWU was certified to represent all employees (approximately 25) in the Data Automation Division (DAD), Western Area Supply Center, Topeka, Kansas, with certain exclusions.

In or before June 1985, ADPCs functions, including those at Teleconcentrator Sites, merged into the PDC function. In 1986, the Postal Service and the APWU voluntarily merged the three previously certified units into one new Postal Data Center (PDC) unit consisting of all employees in the regular work force at PDCs in New York, Minneapolis, San Mateo, St. Louis and Wilkes Barre, excluding managers, supervisors, professional employees, employees engaged in personnel work in other than a purely non-confidential clerical capacity, and security guards.

Shortly after the 1986 merger of units, the Postal Service combined analysis and programming work into one job description and created new unit positions: Computer Systems Analyst/Programmer, Associate, DCS-18; Computer Systems Analyst/Programmer, DCS-20; and Computer Systems Analyst/Programmer, Senior, DCS-22. These duty assignments did not exist at the time of the original certifications. They were necessitated by changes in information technology, which blurred the line between programmer and analyst.

After the 1991 collective-bargaining agreement expired, the Postal Service changed the name of PDCs to ISCs (Information Service Centers).

---

4 For purposes of this Decision and Order Dismissing Petition, the facts set forth in Petitioner's original January 23, 2001 Position Statement and April 9, 2001 supplemental Position Statement are assumed to be true.

In 1992, Postmaster General, Marvin Runyon, reorganized the Postal Service. Prior to the 1992 reorganization, the Postal Service's use of EAS or contract employees to perform programming and analysis work was limited to Postal Headquarters and the Postal Service's non-union facility in Raleigh, North Carolina. Prior to 1992, few, if any EAS employees worked at the PDCs, and those working at the PDCs were not performing bargaining unit work or were in supervisory or managerial positions.

As a result of the 1992 reorganization, a freeze was placed on the hiring of career employees for work at the PDCs. The Postal Service moved the bulk of the information technology (IT) work from headquarters to the PDCs. The Postal Service used unit employees at the PDCs to perform virtually all of the analyst and programming work, including maintenance, enhancement, and new system and subsystem development work. Because of the hiring freeze, transfer of new work and certain changes in technology, the Postal Service began bringing in numerous contract workers and creating new EAS positions and duty assignments in new and existing EAS positions. These contract and EAS employees worked alongside bargaining unit employees on the same projects in the same facilities under joint supervision by Postal Service managers.[5] After the 1992 reorganization, as a result of the influx of contract and EAS employees performing bargaining unit work, the APWU filed numerous work jurisdiction and unit placement grievances.

During 1995-1996 negotiations for a new contract, the Postal Service proposed a unit clarification for the ISCs. No unit clarification petition was filed. During said negotiations, the Postal Service and the APWU bargained over contract worker and EAS employee issues and executed a Memorandum of Understanding (MOU) called the Flexible Resources Memo (FRM) that specifically addressed said issues. The FRM was set to expire on January 20, 1999, and has expired.

After the 1995 collective-bargaining agreement expired, the Postal Service changed the name of ISCs to IS/ASC (Information Systems/Accounting Service Centers).

During 1999 negotiations for a new collective-bargaining agreement, the Postal Service and the APWU exchanged various proposals regarding the use of contract employees and EAS employees to perform unit work. In the fall of 1999, the Postal Service reduced the staff of the ASC Retirement Branch, which was part of the Information Systems/Accounting Service Centers (IS/ASCs). In January 2000, the Postal Service assigned the work previously performed by the staff of the ASC Retirement Branch to contract workers. The Union grieved and arbitrated the assignment of unit work to contract employees (Case Z96D-6Z-C 00119177).

---

5 For example, in 1992, the Postal Service created the EAS Level 23, Business System Analyst position with established duty assignments that involved the performance of analysis and program coding work at the direction of Postal Service supervisors. This work was similar to unit analysis and program coding work performed at the direction of Postal Service supervisors by the DCS Level 22, Computer Systems Analyst Programmer, Senior position, a unit position.

In 1999-2000, the Postal Service and the APWU went to interest arbitration over a new collective-bargaining agreement. They agreed to confine interest arbitration to economic issues and to disagree on all other issues or leave them pending in the grievance procedure for later resolution. The issue of using contract employees and EAS employees in duty assignments to perform bargaining unit work was not addressed in interest arbitration.

On April 26, 2000, Arbitrator Daniel G. Collins issued an interest arbitration award for a successor contract. That contract remained in full force and effect from April 26, 2000 until January 20, 2001, when the parties began bargaining for a new contract.

On December 4, 2000, Arbitrator Linda Dileone Klein issued an award sustaining the Union's grievance in Case Z96D-6Z-C 00119177 and directing the Postal Service to cease and desist from assigning unit work to non-unit personnel and to restore the status quo. Thereafter, the Union sought return of all the work at issue to the unit. The Postal Service objected and claimed that EAS personnel properly had performed some of the work.

By letter dated October 20, 2000, APWU demanded bargaining with the Postal Service and [alleged] Joint Employers (contractors) regarding the wages, hours and working conditions of all employees performing programming and analysis work under the direction and control of the Postal Service at the service centers. The APWU stated that if the Postal Service and the [alleged] Joint Employers were willing to voluntarily recognize the APWU, or to agree to address said issues in negotiations and, if they cannot be resolved, to "agree to disagree," the Union would withdraw its unit clarification petition.

The instant unit clarification petition was filed on October 23, 2000. The petition states that the present unit consists of approximately 1100 employees, and that the unit as proposed would consist of approximately 1500 employees. No breakdown of the number of contract employees vis-a-vis EAS employees has been given.

In 2001, the Union filed a grievance (designated Z98D-6Z-C 01101241) seeking a determination of the status quo regarding Arbitrator Klein's award in Case Z96D-6Z-C 00119177. On March 5, 2001, the Postal Service drafted a Step 2 letter denying the grievance, and claiming that sometimes the work at issue was performed by unit employees and sometimes the work was performed by EAS employees in Field Human Resource offices.

In 2001, the Postal Service changed the name of IS/ASCs to IT/ASCs (Information Technology/Accounting Service Centers). Currently, the Postal Service operates Information Technology/Accounting Service Centers (IT/ASCs) in Minneapolis, Minnesota, San Mateo, California, St. Louis, Missouri, Wilkes Barre, Pennsylvania and Raleigh, North Carolina (non-union).

The IT/ASC bargaining unit consists of employees employed in the Integrated Business Solution Service Center (IBSSC), Accounting Service Center (ASC), Computer Operating Service Center (COSC), and Management Support Service Center (MSSC). The IBSSC consists of employees employed in the computer programmer and analyst duty assignments.

## II. POSITIONS OF THE PARTIES[6]

### A. The APWU's Position

In general terms, the Union contends that its unit clarification petition has been timely filed. The Union also claims that the positions sought to be included have not been historically excluded from the unit, and that even if the positions sought have been historically excluded, they have undergone recent, substantial changes that warrant an exception to historical exclusion principles. The Union further claims that the positions sought share an overwhelming community of interest with unit positions.

The Union argues that it is unnecessary to apply accretion principles because the positions at issue are unit positions that the Postal Service has given to contract employees or EAS employees. Alternatively, the Union argues that even under accretion standards, the unit should be clarified to include the contract employees and EAS employees. The Union claims that these employees represent a small group of employees who have no separate group identity, who cannot be considered a separate unit, and who share an overwhelming community of interest with unit employees.

#### 1. EAS Employees

The Union states that the EAS positions were created at the PDCs after the 1992 reorganization when the Postal Service began transferring work from headquarters to the PDCs and began using EAS employees to perform unit work. Since the pre-existing unit covers non-supervisory, non-managerial employees in programmer and analyst duty assignments at the PDCs (now IT/ASCs), the Union claims the right to include these employees in the unit. The Union argues that the Postal Services's Step II denial of grievance Z98D-6Z-C 01101241 bolsters the Union's argument that certain EAS employees are performing the same work as unit employees and should be brought into the unit.

The Union states that "it was not until recently" that the Postal Service began to flood the unit with these EAS duty assignments. The Union asserts that for years, the Postal Service has claimed that these EAS duty assignments, such as those in the EAS Level 23, Business Analyst Position, were supervisory positions. The Union asserts that it has "recently learned" that employees in these EAS duty assignments have no managerial or supervisory duties or authority and work alongside employees in Level 22

---

6 The salient arguments of the parties are summarized below.

unit positions performing the same work under supervisors or managers at Level 24 or higher. The Union seeks to establish that the Postal Service created and filled EAS duty assignments to perform unit work in order to evade the contractual protection against layoff that unit employees enjoy.

The Union argues that historical exclusion principles are not applicable because the parties voluntarily modified the unit since it was first certified, and because there was no agreement to exclude these positions at the time the parties agreed to modify the unit. Alternatively, the Union argues that recent, substantial changes call into question the placement of EAS employees in the IT/ASC unit. The Union emphasizes that changes in technology since the original certifications and the 1986 voluntary merger, have resulted in changes in job descriptions, the combining of programming and analyst jobs, and the creation of many new duty assignments.

**2. Contract Employees**

The Union argues that the Postal Service and its contractors are joint employers of the contract employees hired to perform unit computer programming and analysis work because they share or co-determine matters governing essential terms and conditions of employment. The Union argues that Congress intended the Board to apply its private sector criteria when determining appropriate bargaining units in the Postal Service and to apply the National Labor Relations Act, to the extent not inconsistent with the Postal Reorganization Act of 1970. Thus, the Union argues that the Postal Service can be a joint employer with private employers because no provision of the Postal Reorganization Act bars such an arrangement.

The Union argues that the contract employees, like the EAS employees, were not specifically excluded at the time of certification or voluntary modification of the unit, and therefore, they have not been historically excluded. Alternatively, the Union claims that recent, substantial changes have occurred since the original certifications that call into question the placement of contract employees. The Union proffers unspecified changes in the organization of unit work, in unit composition, and in unit job descriptions, coupled with the revolution in technology from mainframe computers to personal computers to network computers.

In addition, the Union argues that a recent, substantial change in Board law permits the inclusion of contract workers in the unit. The Union relies on the Board's decision in M.B. Sturgis, Inc., 331 NLRB No. 173 (2000), which overruled Lee Hospital, 300 NLRB 947 (1990), and found no statutory requirement of employer consent in a unit combining solely and jointly employed employees of a single user employer. The Union states that prior to Sturgis, Lee Hospital required consent of the supplier employer to bring contract employees into the unit through a unit clarification petition. The Union argues that any historical exclusion of supplied employees in this case was by operation of law and not by agreement of the parties. Consequently, the Union argues that the Sturgis decision constitutes a recent substantial change, which excuses any historical exclusion that the Board may find. See Dubuque, 289 NLRB 349 (1988); Bud Antle,

Inc., 311 NLRB 1352 (1993); Department of the Navy, Portsmouth Naval Shipyard, 6 FLRA 67 (1981).

Finally, the Union argues that contractual provisions regarding contracting out are irrelevant because the Postal Service is "contracting in" a supplemental workforce to fill unit positions and perform unit work. Therefore, the Union claims a right to represent these employees as part of the existing unit under a joint employer theory that applies the Board's Sturgis decision.

**B. The Postal Service's Position**

The Postal Service argues that the Union's attempt to include unidentified managerial and supervisory EAS employees is an improper attempt to expand the current unit. Similarly, the Postal Service argues that nothing in Sturgis supports a finding that a group of highly skilled workers employed by ten (10) different government contractors, who primarily are engaged in systems and subsystems development work, should properly be part of the existing unit.

The Postal Service emphasizes that this is not a situation where the disputed jobs came into existence during the most recent collective-bargaining agreement. The Postal Service claims that the disputed jobs have existed for many years and this fact of historical exclusion is determinative. The Postal Service emphasizes that the Board does not normally police its certification classifications or the categories of employees who historically have been excluded from the unit. Plough, Inc., 203 NLRB 818 (1973). Moreover, the Postal Service argues that accretion is not appropriate where the employees sought to be accreted have been historically excluded from the larger unit. United Parcel Service, 303 NLRB 326, 326-327, (1991), enfd. Teamsters National UPS Negotiating Committee v. NLRB, 17 F.3d 1518, (D.C. Cir. 1994), citing Laconia Shoe Co., 215 NLRB 573, 576 (1974).

With regard to the contract employees, the Postal Service claims that since the inception of the unit it has, with Union acquiescence, utilized highly-skilled contract workers to perform tasks that are not normally performed by unit employees. Moreover, unlike in Sturgis, the Postal Service emphasizes that every contract since 1974 has contained broad language that allows the Postal Service to contract out work. The Postal Service claims that similar issues have been grieved and arbitrated before Arbitrator Daniel Collins in Case PDC 91-N-15, and that the Union should not be allowed to utilize this proceeding to resolve pending grievances regarding work jurisdiction. The Postal Service says it is disingenuous for the Union to argue that contract workers hired pursuant to contractual subcontracting provisions should now be part of the overall unit.

Finally, the Postal Service emphasizes that one or more of the contractors named in the petition have subcontracted out work to other contractors. The Postal Service argues that bargaining in this context would engender a logistical nightmare that was not contemplated in Sturgis. The Postal Service concludes that as a matter of policy, it should not be beholden to a group of contractors dictating the terms of a collective-

bargaining agreement that could impact internal government regulations. For these reasons, the Postal Service argues for dismissal of the instant petition.

**C. PRC Inc.'s Position**

PRC, Inc. (PRC) is the only contractor that filed a Statement of Position in this matter. PRC is a leading provider of information technology and systems-based solutions. PRC and its predecessors have provided contract employees to the Postal Service since the early 1970's. The employees provided by PRC consist of managerial, professional and a few non-professional employees. PRC provides contract employees at all four Postal Service centers at issue. PRC must fill a Postal Service order for specified labor categories within 15 days. Because of the short lead time, PRC has relationships with 60 subcontractors that assist PRC to fill Postal Service orders with qualified employees. Thus, any employee provided by PRC to the Postal Service may be an employee of PRC or an employee of one of its many subcontractors.

PRC maintains that Sturgis does not change settled unit clarification law. PRC argues that a unit clarification petition cannot be used to accrete a group that has been historically excluded when the first collective-bargaining agreement or any successor agreement was executed. PRC maintains that the contract employees provided by PRC and its predecessors consistently have been excluded from the units covered by successive collective-bargaining agreements since the early 1970's. Consequently, having allowed PRC contract employees to remain outside the unit for such a long time, PRC argues that the Union has no valid reason for requesting an exception from settled Board unit clarification principles.

PRC argues that the instant unit clarification petition was filed too late. PRC claims that prior to Sturgis, the Union could have and should have filed its unit clarification petition seeking to include PRC contract employees with Postal Service employees in the same unit without the consent of both employers. PRC posits that had the Union filed such a petition, it is conceivable that both employers would have consented to the unit, or the Board would have used that petition rather than Sturgis as the vehicle to announce new joint employer law.

PRC asserts that the Union's inaction had nothing to do with joint employer law that pre-dated Sturgis, and was motivated by contractual subcontracting provisions that permitted the Postal Service to use contract employees to perform work at the service centers. PRC notes that prior to Lee Hospital, the Board applied a community-of-interest test to decide whether to include jointly employed employees in units with solely employed employees. Accordingly, PRC argues that the Union could have filed its unit clarification petition during the 16-year period from the first certification in 1974 until 1990, when Lee Hospital was decided. Thereafter, PRC argues that the Union could have challenged Lee Hospital and its absence of rationale. Thus, PRC concludes that Sturgis should not retroactively excuse the Union's failure to act at the appropriate time.

PRC also argues that Jeffboat, the companion case in Sturgis, is inapposite. PRC notes that in Jeffboat, the Union promptly filed its unit clarification petition since a hearing was held in that case on October 11, 1995, shortly after the employer began to use subcontracted employees on August 14, 1995. PRC also distinguishes Jeffboat because there was no history of exclusion of alleged joint employees from any established unit in that case.

Finally, PRC emphasizes that this case involves the Postal Service (user employer), PRC and other prime contractors (supplier employers), and perhaps as many as 60 other subcontractors (also supplier employers). PRC argues that a unit involving employees of 62 or more alleged joint employers is inappropriate from a legal and practical point of view, and that Sturgis cannot be stretched that far.

## III. ANALYSIS

For the reasons set forth below, I find that the instant unit clarification petition concerns positions that have been historically excluded from the unit and have not been shown to have undergone recent substantial changes. I find that no hearing is necessary because application of well-settled Board law to certain undisputed facts warrants dismissal of the petition under historical exclusion principles. Accordingly, I dismiss the petition.

The Board's express authority under Section 9(c)(1) to issue certifications includes the implied authority to police such certifications and to clarify them as a means of effectuating the policies of the Act. Thus, Section 102.60(b) of the Board's Rules and Regulations, Series 8, provides that a party may file a petition for clarification of a bargaining unit where there is a certified or currently recognized bargaining representative and no question concerning representation exists.

The Board described the purpose of unit clarification proceedings in Union Electric Co., 217 NLRB 666, 667 (1975):

> Unit clarification, as the term itself implies, is appropriate for resolving ambiguities concerning the unit placement of individuals who, for example, come within a newly established classification of disputed unit placement or, within an existing classification which has undergone recent, substantial changes in the duties and responsibilities of the employees in it so as to create a real doubt as to whether the individuals in such classification continue to fall within the category—excluded or included—that they occupied in the past. *Clarification is not appropriate, however, for upsetting an agreement of a union and employer or an established practice of such parties concerning the unit placement of various individuals, even if the agreement was entered into by one of the parties for what it claims to be mistaken reasons or the practice has become established by acquiescence and not express consent.*

(italics added). As stated in Robert Wood Johnson University Hospital, 328 NLRB 912, 914 (1999), quoting United Parcel Service, 303 NLRB 326, 327 (1991), enfd. Teamsters National UPS Negotiating Committee v. NLRB, 17 F.3d 1518 (D.C. Cir. 1994):

> The limitations on accretion discussed above and applied in *Laconia Shoe* require neither that the union have acquiesced in the historical exclusion of a group of employees from an existing unit, nor that the excluded group have some common job-related characteristic distinct from unit employees. *It is the fact of historical exclusion that is determinative.*

(italics in original)

A petition seeking to include a classification that historically has been excluded raises a question of representation, which can only be resolved through an election, or based on majority status. Boston Cutting Die Co., 258 NLRB 771 (1981). Similarly, when the employees have not been included in the unit for some time and the union has made no attempt to include the position in the unit, the Board may find that the position is historically outside the unit, and that the union has waived its right to a unit clarification proceeding. Sunar Hauserman, 273 NLRB 1176 (1984); Plough, Inc., 203 NLRB 818 (1973). Accord: ATS Acquisition Corp., 321 NLRB 712 (1996); Robert Wood Johnson University Hospital.

Applying these principles in the circumstances of this case, I find that the contract employees and EAS positions at issue do not fall within any newly established classifications of disputed unit placement or within existing classifications which have undergone recent, substantial changes in duties and responsibilities. Rather, the investigation establishes that the contract employees and EAS positions have been excluded from the existing bargaining unit represented by the Union since at least the 1992 reorganization, and that there have been no recent, substantial changes regarding these positions that warrant processing this petition.

The APWU concedes that after the 1992 reorganization, the Postal Service began bringing in numerous contract workers and creating new EAS positions and duty assignments to perform unit work alongside unit employees on the same projects in the same facilities under Postal Service supervision.[7] Petitioner also admits that during

---

[7] Thus, this case is clearly distinguishable from recent Board cases that have clarified existing units to include "newly created positions" that perform the same basic functions as those historically performed by members of the bargaining unit. See Developmental Disabilities Institute, Inc, 334 NLRB No. 143 (2001); Premcor, Inc., 333 NLRB No. 164 (2001). Similarly, the Board's recent decision in Tree of Life, Inc. d/b/a Gourmet Award Foods, Inc., 336 NLRB No. 77 (2001) is inapposite. In that case, the Board majority found that the employer violated Section 8(a)(5) by refusing to apply certain terms of the collective-bargaining agreement to new hires obtained from suppliers and jointly employed as temporary warehousemen within the plain meaning of the contractual unit description covering drivers and warehousemen. This case, by contrast,

1995-1996 contract negotiations, the Postal Service proposed a unit clarification proceeding for the PDCs. No such unit clarification petition was filed at that time. Instead, the Postal Service and the APWU expressly bargained over the contract and EAS employees in the FRM and agreed to continue their historical exclusion from the unit. Similarly, during 1999-2000 negotiations, the Postal Service and APWU exchanged various proposals regarding the use of contract employees and EAS employees to perform unit work, and they agreed to exclude these issues from interest arbitration. In these circumstances, it is clear that the disputed classifications have been historically excluded from the unit, and that unit clarification would upset an established practice of excluding these positions from the unit. The fact that this practice has been established by acquiescence, and not by express consent, is irrelevant. Union Electric, 217 NLRB at 667. Furthermore, since the contract and EAS employees have been performing unit work alongside unit employees on the same projects under the same supervision since the 1992 reorganization, I find that the disputed classifications have not undergone, recent, substantial changes appropriate for resolution in a unit clarification proceeding. See Bethlehem Steel Corp., 329 NLRB 243, 244 (1990).

In Bethlehem Steel, the Board documented certain exceptions to the principle of historical exclusion. These exceptions apply when 1) unit clarification is sought to exclude a position that historically has been included contrary to statutory requirements, or 2) to prevent enforcement of an arbitration award that effectively accretes a position to a unit in contravention of established Board policy. 329 NLRB at 244, fn. 5. These exceptions to the principle of historical exclusion have no application to this case.[8]

---

is a unit clarification proceeding and there is no unit description or certification that specifically includes the classifications at issue. On the contrary, the classifications at issue have been excluded historically from the unit.

[8] Petitioner's reliance on Dubuque, 289 NLRB 349 (1988), Bud Antle, Inc., 311 NLRB 1352 (1993), and Department of the Navy, Portsmouth Naval Shipyard, 6 FLRA 67 (1981), is misplaced. Dubuque and Bud Antle involved the first exception. In Dubuque, the Board processed a petition to exclude faculty managers as non-employees under NLRB v. Yeshiva University, 444 U.S. 672 (1980). In Bud Antle Inc., the Board dismissed a union petition seeking reconsideration of an employer petition that sought to exclude all nonagricultural employees from a state certification that had applied a single-employer analysis that was inconsistent with Board law. The Board also dismissed an employer petition seeking to exclude cutters as nonagricultural employees and found that the cutters were agricultural employees exempt from coverage of the Act.

In Department of the Navy, Portsmouth Naval Shipyard, the employer granted exclusive recognition to a unit of fire fighters and fire prevention inspectors, excluding supervisory fire fighters. The union sought to clarify the unit to include fire captains (supervisory fire fighters). In 1981, the FLRA panel clarified the unit to include the fire captains because there had been an intervening change in the statutory definition of supervisor and the parties had stipulated that the fire captains were not statutory supervisors. There was no historical exclusion at issue in that case. In any event, the FLRA's analysis is neither based on Board law nor controlling in this proceeding.

I also reject Petitioner's arguments that any historical exclusion should be overlooked because it results from operation of law, or that the Board's decision in Sturgis requires a different result. Board law before Sturgis did not preclude inclusion of the positions sought here, particularly the EAS positions employed solely by the Postal Service. Rather, Board law prior to Sturgis merely required the consent of each employer in an alleged joint employer relationship before a unit could include jointly employed and solely employed employees of a single user employer. The Petitioner advances no contention that such consent was sought or that such action would have been futile. Furthermore, the change in Board law under Sturgis does not constitute a recent, substantial change in the duties and responsibilities of the positions at issue as contemplated in Union Electric.

In sum, I conclude that that the EAS and contract employees at issue have been historically excluded from the bargaining unit, and have not undergone recent, substantial changes in duties and responsibilities sufficient to create any real doubt as to whether they continue to fall within an excluded category. I further find that no recognized exception to the doctrine of historical exclusion is applicable. Accordingly, I dismiss the petition.[9]

ORDER

IT IS HEREBY ORDERED that the petition filed herein be, and it hereby is dismissed.

---

[9] I note that the Union may seek to represent these employees through a representation petition, which affords the employees an opportunity to choose whether or not to be represented in the existing unit. In this way, postal employees, who are barred from striking, will be given the opportunity to decide important statutory issues for themselves. See United States Postal Service v. NLRB, 969 F.2d 1064, 1068 fn. 3 (D.C. Cir. 1992).

RIGHT TO REQUEST REVIEW

Under the provisions of Section 102.67 of the Board's Rules and Regulations, a request for review of this Decision may be filed with the National Labor Relations Board, addressed to the Executive Secretary, 1099 14th Street, NW, Washington, DC 20570. This request must be received by the Board in Washington by DECEMBER 10, 2001.

Dated: November 26, 2001
At Baltimore, Maryland

/s/ WAYNE R. GOLD
*Regional Director, Region 5*




393-8000